IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| K.C., individually and as Next Friends of their son, and A.C., a minor, et al.,<br><br>　Plaintiffs,<br><br>　　v.<br><br>FULTON COUNTY SCHOOL DISTRICT, et al.,<br><br>　Defendants. | CIVIL ACTION FILE<br>NO. 1:03-CV-3501-TWT |

ORDER

This is an action under the Individuals with Disabilities Education Act ("IDEA"), the Americans with Disabilities Act ("ADA"), and the Vocational Rehabilitation Act. It is before the Court on Defendant Fulton County School District's Motion for Summary Judgment [Doc. 57] and the Plaintiffs A.C. and his parents' Motion for Partial Summary Judgment [Doc. 58]. For the reasons set forth below, the Defendant's motion is GRANTED and the Plaintiffs' motion is DENIED.

I. PROCEDURAL HISTORY

On July 24, 2003, A.C. and his parents filed a due process hearing request against the Fulton County School District seeking public reimbursement and other compensatory payments for violations of their rights under the IDEA, 20 U.S.C. §

1400, *et seq.*[1]  The limitations period for an IDEA claim is the two year statute of limitations that applies to personal injury actions.  <u>Mandy S. *ex rel.* Sandy F. v. Fulton County Sch. Dist.</u>, 205 F. Supp. 2d 1358, 1366 (N.D. Ga. 2000), <u>aff'd</u>, 273 F.3d 1114 (11th Cir. 2001).  Thus, the Court will consider only claims accruing within two years prior to their due process request, which includes events occurring after July 24, 2001.  The relevant period begins with the 2001-02 academic year, when A.C. was in the fourth grade, and extends through the end of his fifth grade year.

In response to this due process request, a State of Georgia Administrative Law Judge ("ALJ") heard testimony and arguments from both parties and made findings of fact and conclusions of law based on this record.  The ALJ ultimately determined that the Defendant had not violated the Plaintiffs' procedural rights and that A.C. had been provided with a free appropriate public education.  The Plaintiffs seek to have that decision set aside by this Court.  They seek to recover: (1) reimbursement for services provided to A.C. by Sylvan Learning Centers totaling $10,611.00 over the course of two years; (2) the $100.00 cost of reading assistive technology purchased by A.C.'s father; and (3) the compensatory cost of education in the Lindamood-Bell

---

[1]The Plaintiffs also claimed violations under section 504 of the Vocational Rehabilitation Act of 1973, 29 U.S.C. § 794(a), and Title II of the ADA, 42 U.S.C. § 12132.  However, because the ALJ lacked jurisdiction to hear these claims, the matter was preserved on the record.  (Admin. Rec., at 59.)

program in the amount of $18,630.00.  For actions brought pursuant to the appeals procedure in the IDEA, the district court: "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C).

## II. SUMMARY JUDGMENT STANDARD

A district court may decide an IDEA case by summary judgment even where facts are in dispute, based on the preponderance of the evidence.  Loren F. *ex rel.* Fisher v. Atlanta Indep. Sch. Sys., 349 F.3d 1309, 1313 (11th Cir. 2003).  Thus, the usual summary judgment rules under Rule 56 of the Federal Rules of Civil Procedure do not apply.  Id.  In reviewing an ALJ's decision, "due weight" should be given to the determinations made during the administrative hearing.  Board of Educ. of Hendrick Hudson Central Sch. Dist., Westchester County v. Rowley, 458 U.S. 176, 206 (1982).  The court must consider the administrative findings of fact, but has the discretion to accept or reject them.  Doe v. Alabama State Dept. of Educ., 915 F.2d 651, 657 n.3 (11th Cir. 1990); Jefferson County Bd. of Educ. v. Breen, 853 F.2d 853, 857 (11th Cir. 1988).  When exercising this discretion, the Eleventh Circuit has further noted that a district court is required to respect an ALJ's findings when they are "thoroughly and carefully made."  Cory D. *ex rel.* Diane D. v. Burke County Sch.

Dist., 285 F.3d 1294, 1298 (11th Cir. 2002).  To prove by a preponderance of the evidence "simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence."  U.S. v. Trainor, 376 F.3d 1325, 1331 (11th Cir. 2004) (citing Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for So. Cal., 508 U.S. 602, 622 (1993)).

### III. FINDINGS OF FACT

Having reviewed the administrative record under the foregoing standard, this Court credits the ALJ's findings of fact and holds that they are supported by a preponderance of the evidence.  Although the only period relevant to this claim involves A.C.'s fourth and fifth grade years, the Court discusses his second and third grade record to provide background for the services he was receiving during the relevant period.

A.C. was a resident of Fulton County between 1999 and 2003.[2]  He has been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD").  In the fall of 1999, prior to his second grade year, A.C. moved with his family from Illinois to Georgia, and enrolled in Fulton County's New Prospect Elementary School.

A. Second Grade (1999-2000 School Year)

---

[2]The record indicates that A.C.'s family has now established residence in New Jersey, making him no longer eligible for Fulton County School District services. (Test., at 36, 242.)

Upon A.C.'s enrollment, the Defendant, Fulton County School District ("FCSD"), initially used the Individualized Education Program ("IEP") developed for him in Illinois.  After sufficient time had passed to allow for the development of a new IEP, the Defendant scheduled a meeting to create its own temporary diagnostic IEP. They notified his mother, who indicated that she would attend. At this meeting, A.C.'s mother received notice of her parental rights and waived oral review of those rights.

The Defendant determined that A.C. was eligible for special education services under the eligibility categories of Learning Disabled and Speech Impaired.  It was specifically recommended that he receive two hours per day of special education services to address his learning disabilities in the areas of reading and language arts, and ninety minutes per week of speech language therapy to address his articulation needs.  This IEP also contained accommodations for A.C. both in the general education classroom and related to standardized, state-mandated and system wide testing.  A.C. was to take the Iowa Test of Basic Skills ("ITBS") in a small group and receive extended time, but required no accommodation to have the test read to him. This IEP was in effect from August 30, 1999, to November 16, 1999.  A.C.'s mother signed both this IEP and the consent for his initial placement.

The Defendant subsequently evaluated whether A.C. was eligible to receive special education services and, on November 3, 1999, completed a Special Education Eligibility Report. Based on this report, the Defendant determined that A.C. was eligible to receive these services under the primary eligibility category of Specific Learning Disabilities. His learning disability affected his reading and language arts skills. A.C.'s mother attended a meeting to discuss this report and signed documentation concurring with this determination. At the same time, the Defendant also completed a Speech Language Eligibility Report that found A.C.'s expressive and receptive language skills to be within normal limits. However, the report did identify articulation errors and determined that he was eligible to receive speech language services under the secondary eligibility category of Speech-Language Impaired. A.C.'s father signed documentation showing that he concurred with this determination.

At this same time, the Defendant held an IEP committee meeting, attended by A.C.'s parents, to develop his IEP. At the meeting his parents received another copy of their parental rights, which were reviewed orally with them. The committee reviewed A.C.'s eligibility reports and his current level of functioning, noting his strength in math and weaknesses in reading and language arts. His fine and gross motor skills were determined to be age appropriate. The 1999 IEP goals targeted

these areas of disability: reading, language arts and articulation skills.  The IEP provided that he would receive two hours of instruction per day in an interrelated resource classroom for his specific learning disability related to reading and ninety minutes per week of speech language therapy for articulation.  This resource classroom served only students needing special education services for reading and language arts skills.  Furthermore, he would continue to take the ITBS in a small group and receive extended time, but without having the test read to him.  This IEP was in effect from November 3, 1999, to June 2, 2000.  In March 2000, A.C. took the ITBS, which compared his performance to that of every other child in the nation who takes the test.  He scored at the 2.0 grade level for reading and the 3.8 grade level in math.

B. Third Grade (2000-01 School Year)

On May 12, 2000, the Defendant convened its annual IEP meeting, with A.C.'s parents in attendance, to review his second grade year and develop an IEP for his upcoming third grade year.  At the meeting, his parents received a copy of their parental rights, which were reviewed with them.  The committee reviewed his current levels of functioning and determined that his oral expression and fine and gross motor skills were age appropriate.  The committee also reviewed his results on the Brigance Comprehensive Inventory of Basic Skills ("Brigance"), administered in the spring of

2000.  A.C. scored in the second grade level in word reception, spelling and computation skills, and at the third grade level in reading comprehension and word problems.  The committee reviewed A.C.'s progress in goals and objectives from the previous year's IEP.  All of his goals were determined to be "met," although some went from "in progress" to "met."  (Joint Ex. 10, at 15-18.)  The committee also developed new goals and objectives that raised A.C.'s expected competency and instruction levels from the previous year.  These goals and objectives were designed to address and improve his auditory processing skills, specifically addressing phonetic decoding, word attack skills, and providing oral answers to reading comprehension questions.  Speech goals were also developed to continue his progress regarding articulation.

The committee determined that the 2001-02 educational placement would include two hours per day in the resource classroom to address his reading disability and ninety minutes per week of speech therapy.  A.C. would continue to take standardized tests in a small group, receive extended time, have directions repeated, and be given a limited amount of answer choices on tests as necessary.  He required no accommodation to have any of the tests read to him.  A.C.'s mother signed this IEP, which was in effect from August 21, 2000, to June 1, 2001.

On December 5, 2000, the Defendant convened a meeting at A.C.'s parents' request.  His parents wanted to reduce his speech therapy services to one hour per week.  A.C.'s mother indicated that she would not attend but would receive a copy of the recommendations.  It was agreed that his speech therapy services would be reduced as requested and that his IEP for that school year would be amended.

In March 2001, A.C. took the Stanford-9 Achievement Test, a standardized, norm-referenced test.  He scored below average in several areas related to reading and language arts.  That same month, he also took the Georgia Writing Assessment, a test that is graded outside of the school by an independent state reviewer.  The reviewer determined that A.C. was a Stage 2 Developing Writer.

C. Fourth Grade (2001-02 School Year)

On May 9, 2001, the Defendant convened its annual IEP meeting, attended by A.C.'s mother, to review his third grade year and develop an IEP for his upcoming fourth grade year.  His parents received a copy of their parental rights and waived oral review.  The committee reviewed his third grade scores on Brigance, which revealed that he tested at grade level in every category except spelling and word problems, in which he tested at the second grade level.  The committee also reviewed his fine and gross motor skills. They found his gross motor skills to be age appropriate, but determined that his fine motor skills needed work on correct size, formation and

spacing in his handwriting.  According to the Defendant's middle school coordinator, Ms. Dottie Pettes, this was a typical concern for most children as they move into cursive handwriting.  (Test., at 413, 419.)  The committee reviewed A.C.'s goals and objectives and determined that he had mastered them.  Given this progress, they concluded that he did not require extended school year ("ESY") summer services.

The committee developed new goals and objectives for A.C. in the areas of reading and language arts and increased the expected competency and instructional levels from the previous year's IEP.  These goals and objectives were again designed to improve his auditory processing skills, specifically his phonetic decoding, word attack, and his ability to orally answer reading comprehension questions.  The committee also developed new speech goals to continue his progress regarding articulation.

The committee determined that A.C.'s educational placement for the 2001-02 school year would continue to include two hours per day in the resource classroom to address his reading disability and one hour per week of speech language therapy to address his articulation needs.  He was again given accommodations for standardized testing that allowed him to take the tests in a small group with extended time and have the directions repeated if necessary.  He would also receive help from the instructor regarding reading of tests and assignments, have math word problems read to him by

the instructor, receive study guides before tests, if appropriate, and receive a set of books for his mother to use at home.  A.C.'s mother signed this 2002 IEP, which was in effect from August 13, 2001, to May 24, 2002.

On September 14, 2001, the Defendant convened a meeting to amend his IEP. In the opinion of his speech language pathologist, he had consistently demonstrated mastery of his speech language goals and no longer needed that service.  After A.C.'s mother expressed reservations, it was agreed that he would be monitored for thirty minutes per week for approximately one month to ensure that he maintained his speech language skills.  A.C.'s parents were sent the paperwork for their approval along with a copy of their rights.  On December 6, 2001, the Defendant sent A.C.'s parents the Parent Notice of Reevaluation form indicating that A.C. was no longer eligible to receive speech language services due to consistent mastery of his speech language goals and present educational performance.   His mother signed her agreement with the recommendation.   On December 11, 2001, the committee reconvened and agreed to dismiss A.C. from speech language therapy.  A.C.'s parents, while not in attendance, indicated their agreement with the committee's action.

In the spring of 2002, A.C. took the Georgia Criterion Referenced Competency Test ("CRCT"), a state mandated test that is used to measure whether students are meeting state standards and making adequate yearly progress pursuant to the No Child

Left Behind Act.  The CRCT test questions were not read to him, although as provided in his IEP, he did take the test in a small group with extended time and with the directions read to him as necessary.  A.C. met the competency requirements in all three content areas tested: reading, English/language arts and mathematics.  On his fourth grade report card, A.C. received B's in language arts during each and every reporting period.  He used a modified curriculum, but materials were on grade level.

    D. <u>Fifth Grade (2002-03 School Year)</u>

On April 17, 2002, the Defendant convened its annual IEP meeting, attended by A.C.'s mother, to review his fourth grade year and develop his IEP for the upcoming 2002-03 school year.  His mother received a copy of the parental rights and waived oral review.  In reviewing his level of performance, the committee noted that he was more likely to continue to achieve success and progress in reading in the structured resource setting.  The committee determined that A.C.'s speech and language skills and his fine and gross motor skills were age appropriate.  The quality of his cursive handwriting was acceptable.

The committee also reviewed his performance on the Brigance administered that spring.  His grade level functioning had increased at least one full grade level in every area.  In the areas of Word Problems and Reading Comprehension, he had increased by two grade levels.  His reading, however, was only on a third grade level.

It was further noted that his test scores were lower than his average daily performance on classroom, quizzes and unit tests. The committee reviewed his progress in goals and objectives and determined that he had mastered every goal and objective except for one, on which he was three percentage points short of mastery. Given his progress, the committee determined that he did not require ESY summer services.

The IEP committee developed new goals and objectives for A.C. to continue his progress in the areas of reading and language arts and increase the expected competency and instructional levels from the previous year's IEP. As in past years, they established certain auditory processing goals specifically designed to address his phonetic decoding, word attack and ability to orally answer reading comprehension questions. His educational placement would continue to provide two hours in the resource classroom for language arts and reading. In addition to his continued standardized test accommodations, the IEP committee also determined that he should receive certain accommodations in the general education classroom. Included among these were the use of a notebook to record assignments, receiving a study guide for science and social studies as needed, receiving note taking accommodations and a set of science and social studies books to use at home. A.C.'s mother signed this IEP, which was in effect from August 12, 2002, to May 23, 2003.

During this committee meeting, it was also determined that A.C. needed to undergo a comprehensive reevaluation and have his continued eligibility for special education services determined by November 3, 2002.  Parental consent was given for this reevaluation.  A.C.'s teachers thus prepared a Skills Inventory checklist.  This checklist showed that his motor coordination, oral expression, listening comprehension and mathematics skills were all age appropriate.  He had weaknesses in the areas of reading and written expression, where his mastery of basic reading and reading comprehension was below the fifth grade level.

A certified school psychologist, Ms. Wendy Barker, completed a comprehensive reevaluation for A.C. in October 2002 to assist in determining his eligibility for special education services.  His fine motor skills were tested to be within the 65th percentile and his phonological processing was within the average range for his age despite it being a personal weakness for him.  She noted a continued relative weakness, however, in his reading and language due to his disability.  Specifically, he showed weakness in the areas of written expression, reading and reading comprehension.   There was a significant difference between his verbal and performance scales indicating that his nonverbal reasoning skills were more highly developed than his verbal reasoning skills. She administered the Wechsler Intelligence Scale for Children - Third Edition ("WISC-III"), a battery of tests that evaluate a

child's intellectual abilities.  This test is usually a good predictor of future learning and academic success.  A.C. tested as having a Full Scale Intelligence Quotient in the 84th percentile, comprised of a Verbal Quotient in the 50th percentile and a Performance Quotient in the 98th percentile.  She estimated him as having an I.Q. of 130, which is in the 98th percentile for his age group.  She identified him as having a significant discrepancy between his ability and achievement scores in the areas of basic reading, reading comprehension, and written expression.  This discrepancy, according to Ms. Barker, indicated how he was actually functioning in the classroom. She concluded, however, that he "continue[d] to possess many of the characteristics and criteria consistent with other individuals who have Learning Disabilities."  (Joint Ex. 21, at 11.)

On November 8, 2002, the Defendant determined that A.C. continued to meet the criteria for special education services.   The eligibility team reviewed his educational history and prior interventions.  It was noted that he had been receiving special education services for reading and language arts under the eligibility category of Specific Learning Disabilities continuously since November 1999 and that these services had resulted in "steady progress."  (Joint Ex. 23.)  Both parents attended this meeting and signed the eligibility report indicating their agreement.

In March 2003, during the spring of his fifth grade year, A.C. took the ITBS standardized test.  He scored at the 4.6 grade reading level in reading, which was a 2.6 grade improvement since he had previously taken the test in the spring of 2000.  By comparison, his math total was now at a 7.2 grade level, an improvement of 3.4 grades.  As provided in his IEP, he did not require that the questions be read to him.  Also that spring, A.C. took the Georgia Writing Assessment.  He received no assistance on this test and the Defendant had no involvement in its scoring.  The Georgia Department of Education determined him to be a Stage 5 Engaging Writer.  A.C.'s fifth grade report card shows that he earned B's in language arts during each reporting period with a modified curriculum.  He used the fifth grade reading and language arts materials throughout his fifth grade year.

Throughout his fourth and fifth grade years, he was also given the Basic Literacy Test to assess his reading abilities and measure his educational progress through the academic curriculum.  His test scores steadily improved throughout this time.  He received a score of 100 out of 100 at the January 2003 administration of the test.  In March 2003, A.C.'s parents requested that he receive the Fast ForWord program.  Ms. Michelle Norton, the instructional support teacher at New Prospect Elementary School, asked a speech language pathologist to review A.C.'s psychological report and make a recommendation concerning this request.  Following

that review, Ms. Norton decided there was no need to explore eligibility or speech language therapy for him.

E. Plan for Sixth Grade Year

Due to the scheduling needs of the participants, A.C.'s 2002 IEP was extended through the end of his fifth grade year.  The 2003 IEP committee meeting was subsequently held on May 15, 2003, to review his progress and develop a draft IEP for his sixth grade year.  Among those in attendance were A.C.'s parents and their attorney, Ms. Chris Vance.  During this meeting, Ms. Vance asked for copies of A.C.'s reading and assessment records.

At this time, A.C.'s parents also presented the Defendant with a speech language evaluation and central auditory evaluation privately conducted by Children's Healthcare of Atlanta in March 2003.  This evaluation of his speech language and auditory processing diagnosed him as having a language disorder with a host of specific disabilities.  Also at this May 2003 meeting, his parents informed the Defendant for the first time that they had obtained private tutoring for their son at Sylvan Learning Centers.

The committee then reviewed A.C.'s progress on goals and objectives for the fifth grade year and determined that he had mastered all except for one, which was two percentage points short of mastery.  His parents requested that, for the summer

of 2003, he receive ESY services specifically for the Fast ForWord program and one-to-one reading instruction.  The IEP committee agreed to this request even though they had determined that he did not meet the eligibility criteria to receive ESY services.

His parents also requested and received a private psychological evaluation performed by Dr. Marlyne Israelian at the Defendant's expense.  She performed this evaluation on June 28 and 29, 2003, following a referral from the Defendant.  A.C. was instructed not to take his prescribed medications for ADHD during the evaluation, which consisted of ten hours of testing over two days.  Dr. Israelian evaluated him in three main areas: academic achievement, intellectual abilities and cognitive functioning.  She reviewed records of A.C.'s history, the Defendant's most recent evaluations of him in 2002, the speech language evaluation of him through Children's Healthcare, and auditory testing.  She found A.C.'s intellectual abilities to be in the high average range and that his reading and spelling scores were not commensurate with this.  Based upon her administration of the WISC-III, Dr. Israelian found A.C.'s full-scale I.Q. to be 105.  She found his verbal I.Q. to be 93, placing him in the 25th percentile when compared to his same age peers, and his performance I.Q. to be 117, which placed him at the 87th percentile.  She believed his true I.Q. score fell between

the range of 107 and 123 and would place him at 117, a high average range of intellect.

She also prepared a chart using A.C.'s achievement scores at the age tested and contrasted his achievement levels from the end of first grade in Illinois with the end of fifth grade as she tested in June 2003.  Based upon the chart and her analysis of it, Dr. Israelian opined that A.C. had improved only three to four months each year over four years.  She further determined that, despite the fact that he was at the end of his fifth grade year: (1) his word attack skills were at a 2.7 grade level; (2) his letter word identification abilities were at a 3.4 grade level; (3) his phonemic decoding was at the 3.2 grade level; (4) his basic reading was at a 3.2 grade level; and (5) his passage comprehension was at a 3.1 grade level.  Based on this evidence, she told A.C.'s father that she found no measurable change in his performance during his time in FCSD. She recommended him as a good candidate for the Lindamood-Bell program, which would provide him with a variety of aids to assist with his ADHD.

That summer, A.C. also received 18 hours of instruction from Ms. Lisa Gray, a certified special education teacher.  During their sessions, he did not take his ADHD medication and Ms. Gray noted him as having a high degree of activity and that he was easily distracted.  She also found, however, that he could easily read fourth grade level materials and estimated his reading ability to be at the beginning of fifth grade.

In working with him, she also noted a strong knowledge base in vocabulary, an ability to recall the meanings of unfamiliar words at 90% accuracy, and strong ability to decode words.  She also found his comprehension skills to be very strong at the fifth grade level.  He further exhibited a high degree of mastery of oral reading fluency, reading at a rate of more than 130 words per minute.  In assessing A.C.'s writing ability, Ms. Gray found that he was able to develop a topic, write fairly freely, use strong editing skills, and could write in cursive as a final copy.

Finally, in preparation for his use of the computer Fast ForWord program, the Defendant administered a pretest in order to gauge his progress over the course of the program.  He met 90% criteria for mastery for 28 out of the 33 testing objectives. Because A.C. left the school district, however, no post test was ever conducted.

## IV. DISCUSSION

### A.    IDEA Claims

The IDEA's stated purpose is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs."  20 U.S.C. § 1400(d)(1)(A).  To accomplish this purpose, state and local educational authorities are required to identify and evaluate children with disabilities and develop IEP's for each disabled child.  See 20 U.S.C. § 1411; Mandy S., 205 F. Supp. 2d at 1366.  If the

parents of the disabled child are dissatisfied with that IEP, the educational agency is required to give them an impartial due process hearing.  20 U.S.C. § 1415(f).

The Supreme Court has identified the following two part inquiry for determining whether the School District has met the IDEA's requirements for a free appropriate public education:  "First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?"  <u>Rowley</u>, 458 U.S. at 206-07; <u>see also</u> <u>M.M. <em>ex rel.</em> C.M. v. School Bd. of Miami-Dade County, Fla.</u>, 437 F.3d 1085, 1097 (11th Cir. 2006).  The Plaintiffs challenge the Defendant's actions under both the procedural and substantive prongs of this test.  Because A.C.'s parents are attacking a program to which they previously consented on each and every one of his IEP's, they bear the burden of showing why it is inappropriate.  <u>Devine v. Indian River County Sch. Bd.</u>, 249 F.3d 1289, 1292 (11th Cir. 2001); <u>see also</u> <u>Schaffer <em>ex rel.</em> Schaffer v. Weast</u>, 126 S. Ct. 528, 537 (2005) ("The burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief").

## 1. <u>Procedural Rights</u>

The Plaintiffs make several allegations regarding the Defendant's failure to comply with the IDEA's procedural requirements.  To succeed in this procedural

challenge, the Plaintiffs must show that the Defendant either failed to provide educational benefit or restricted A.C.'s parents' ability to participate fully in their child's education. Gwinnett County Sch. Dist. v. J.B. ex rel. D.B., 398 F. Supp. 2d 1245, 1249 (N.D. Ga. 2005) (citing Collier County Sch. Bd. v. K.C., 285 F.3d 977, 982 (11th Cir. 2002)). The Plaintiffs attempt the latter, alleging that they have been denied the opportunity to participate fully in A.C.'s education because the Defendant: (1) prohibited them from examining all records related to A.C.; (2) withheld information regarding A.C.'s training in his school's resource classroom; (3) failed to identify and report A.C.'s fine motor, receptive and expressive language, and auditory disabilities; (4) never told them about the related services and assistive technology that would have helped with A.C.'s reading and writing issues; and (5) misinformed them about A.C.'s lack of progress on his IEP goals. However, "[i]n evaluating whether a procedural defect has deprived a student of a FAPE, the Court must consider the impact of the procedural defect, and not merely the defect per se." Weiss v. School Bd. of Hillsborough County, 141 F.3d 990, 994 (11th Cir. 1998). No single violation of the IDEA's procedures can be a per se violation of the Act. Id. at 996. Using these guidelines, the Court will assess each of these allegations in turn.

a. Access to Student Records

The Plaintiffs first claim that the Defendant has denied them rightful access to certain documents in A.C.'s educational record.   The procedural safeguards established under the IDEA require that parents have the opportunity to examine all records relating to their child.  20 U.S.C. § 1415.  For the purposes of the IDEA, "education records" means the types of records covered under the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g; 34 C.F.R. § 300.560 (b). FERPA grants parents the right "to inspect and review the education records maintained by the State educational agency."  20 U.S.C. § 1232g (B).  Here, the Plaintiffs claim that they have been wrongfully denied access to: (1) 700 pages of A.C.'s records held by the Defendant; (2) data, writing samples and other records held by A.C.'s summer reading instructor, Ms. Lisa Gray; and (3) a pre-test administered to A.C. in the summer of 2003.  Upon further examination, the Court finds these arguments unpersuasive.

i.   <u>Records of A.C.'s Writing Samples, Evaluations, Written Assignments, and Worksheets</u>

The Plaintiffs allege that prior to the due process hearing, the Defendant failed to provide them with 700 pages of A.C.'s records including writing samples, evaluations, written assignments and worksheets to which they had rightful access. The crux of this dispute hinges on what documents constitute "education records" under FERPA.  The Supreme Court's discussion of this term in <u>Owasso Indep. Sch.</u>

<u>Dist. No. I-011 v. Falvo</u>, 534 U.S. 426 (2002), is instructive on this issue.  There, a parent challenged an Oklahoma school district's practice of allowing students to grade each other's work and report the scores to the class, claiming that this was a violation of the student's privacy rights under FERPA.  The Court explained, "[i]t is doubtful Congress would have provided parents with this elaborate procedural machinery to challenge the accuracy of the grade on every spelling test and art project the child completes."  <u>Id.</u> at 435.  The Court went on to state that any construction of the term "education records" that included "student homework or classroom work would impose substantial burdens on teachers across the country."  <u>Id.</u>  Thus, while a teacher's grade book might be a part of the child's educational record, individual student papers certainly were not.

The Supreme Court has thus made clear that parental access to "education records" does not extend so far as to allow access to each individual piece of student work. The Plaintiffs were provided with the material when they subpoenaed it for the due process hearing.  There was no IDEA violation by the school district in not providing the material earlier.  The Court, therefore, concludes that the Defendant's denial of access to these records is not an IDEA procedural rights violation.

ii.     <u>Summer Reading Instructor's Records</u>

The Plaintiffs also claim a right to access Ms. Lisa Gray's data, writing samples and other records collected during the summer term when she taught A.C.  As discussed above, writing samples and other daily work are not within the definition of "education records."  It appears that the Plaintiffs also seek to obtain her personal notes regarding A.C.'s IEP progress.  (Pls.' Mot. for Summ. J., at 40-41.)  Georgia Board of Education Rules state that parents have the right to "all information used in assessing the student or in evaluating the IEP, including all data as and reports or summaries of such data."  GA BOE Rule 160-4-7-.18(1)(g)(5).  Again, this Court must determine whether such data falls within the scope of the term, "education records."  FERPA excepts from its scope records of "instructional, supervisory, and administrative personnel and educational personnel ancillary thereto which are in the sole possession of the maker thereof and which are not accessible or revealed to any other person except a substitute."  See 20 U.S.C. § 1232g (a)(4)(B)(i).  Here, however, Ms. Gray testified that she allowed A.C.'s mother to review these notes at the end of every session with A.C.  (Test., at 834.)  The Court thus finds that because these notes constitute information used in assessing A.C. and were accessible to individuals other than a teacher or substitute, they do not constitute sole possession records and the Plaintiffs had a right of access to them.

The Plaintiffs must also demonstrate, however, that this procedural violation restricted them from full participation in A.C.'s education.  See Weiss, 141 F.3d at 994. They argue that these notes could have been used by their psychologist, Dr. Joan Teach, in assessing the appropriateness of Ms. Gray's data collection. (Admin. Rec., at 319-20.)   The Plaintiffs submitted an affidavit from Dr. Teach as additional evidence after the close of evidence at the administrative hearing.  They failed, however, to make a request to add this evidence to the record in this proceeding.  See 20 U.S.C. § 1415(i)(2)(C)(ii) (allowing a district court to hear additional evidence at the request of a party).  This evidence, therefore, will not be considered by the Court.

Furthermore, the Court does not find that this evidence, even if considered, would demonstrate that A.C.'s parents were restricted from fully participating in their son's education.   In order to show a procedural violation, A.C.'s parents must demonstrate that their lack of access to this data "seriously infringed" upon their opportunity to participate in their son's IEP process.  Knable ex rel. Knable v. Bexley City School Dist., 238 F.3d 755, 765 (6th Cir. 2001); see also Independent Sch. Dist. No. 283 v. S.D. ex. rel. J.D., 88 F.3d 556, 562 (8th Cir. 1996) (requiring a showing that a procedural violation "seriously hampered the parents' opportunity to participate in the formulation process").  Here, Dr. Teach states only that if she had access to Ms. Gray's data collection, including A.C.'s writing samples, she would have "testified

as to the appropriateness or lack thereof of her data, the reading level of the work she did with A.C. over the summer, and the writing level of A.C.'s samples, including providing detailed analysis and interpretation in this regard."  (Admin. Rec., at 320.) This testimony does not demonstrate a serious infringement of the Plaintiffs' rights for several reasons.  First, part of what Dr. Teach required to make this determination were A.C.'s writing samples, information to which the Plaintiffs were not entitled. Furthermore, Ms. Gray's assessment of A.C.'s reading and writing levels as of the summer of 2003 is only one of many pieces of evidence demonstrating his academic progress.  Dr. Teach's ability to confirm or refute that evidence did not significantly affect A.C.'s parents' ability to participate in this IEP challenge.  Therefore, this procedural violation had no demonstrable impact on this proceeding and does not constitute a violation of the IDEA's requirements.

### iii.   Fast ForWord Pre-test

Finally, the Plaintiffs assert a right to the pre-test administered to A.C. as part of the Fast ForWord program.  The Plaintiffs cite to a 1997 memorandum from the director of the Family Policy Compliance Office which states that "completed test instruments. . . constitute 'education records' subject to the FERPA requirements."[3]

---

[3]Because Congress has not directly spoken on this issue, this opinion by the administrative agency in charge of enforcing FERPA is entitled to deference by this Court.  See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467

(Def.'s Mot. for Summ. J., Att. 2.)  The Defendant correctly points out, however, that because this was only a pre-test, it was not a completed test instrument.  Indeed, A.C. left the state before a post test could be conducted.  They have no grounds for demanding this incomplete test protocol.

Again, even if the Plaintiffs could demonstrate a procedural right of access to this pre-test, the Court finds that their lack of access to this data did not seriously infringe upon their ability to participate in A.C.'s IEP.  The Plaintiffs offer this test as further evidence that A.C. ranked more than two standard deviations below normal on language testing even though his estimated I.Q. was two standard deviations above normal.  They cite Dr. Teach's affidavit again to demonstrate how this information would have been used.  (Pls.' Mot. for Summ. J., at 38.)  As discussed above, Dr. Teach's affidavit was not offered into evidence and, even if considered, does not demonstrate a procedural violation.

b. <u>Composition of Classroom</u>

---

U.S. 837, 844 (1984) ("We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer").

The Plaintiffs next assert that the Defendant violated State of Georgia standards regarding composition of the students in a resource classroom by having too many children in too many grade levels.  Georgia Board of Education Rules explicitly provide that, for children with emotional and behavioral disorders, a resource classroom may have no more than seven children with one teacher, or ten children with a teacher and a paraprofessional.  GA BOE Rules 160-4-7-.11, Appendix A. Special Education Segment Reports from A.C.'s resource classroom indicate that on several days the classroom had eight students and no assistant.  (Plaintiffs' Ex. 28.) However, Ms. Michelle Norton, an Instructional Support Teacher at New Prospect, testified that there would never have been more than seven students in the resource classroom with only one teacher.  (Test., at 517-18, 558.)  The ALJ, moreover, concluded that there were never more than seven students with one teacher. (Admin. Rec., at 81.)  Although A.C.'s father testified that the classroom consisted of eight to twelve children, even the Special Education Segment Report does not support this assertion. (Test., at 207; Plaintiffs' Ex. 28.)  Furthermore, neither he nor his wife ever requested a visit to their son's resource classroom.  (Test., at 506-07.)  This Court finds that the preponderance of the evidence supports the ALJ's conclusion that Georgia standards regarding resource classroom composition were not violated.

The Plaintiffs also claim that the Defendant violated Georgia law by having students on four different grade levels represented in the resource classroom. However, they have failed to identify any Georgia law to support their contention that this was illegal.  The Court thus concludes that no procedural violation occurred.

### c. Failure to Report Disabilities

The Plaintiffs also assert that the Defendant failed to identify and report A.C.'s fine motor, receptive and expressive language, and auditory disabilities.  This assertion is simply not substantiated by the evidence.  His receptive and expressive language disabilities were identified on his fourth grade IEP and addressed through ten hours a week of writing and ninety minutes a week of speech training with a certified special education teacher.  (Joint Ex. 12.)  The Defendant thus provided A.C. with speech language services throughout his enrollment and ceased those services only when the school and A.C.'s parents explicitly agreed that he no longer required them.  (Joint Exs. 12; 13; 14; 15; and 16.)  Indeed, it was the Plaintiffs who first requested a reduction in speech impaired services.  (Joint Exs. 12; 45.)  His auditory processing skills were similarly addressed throughout enrollment.  (Joint Exs. 3; 8; 10; 12; 13; 14; 15; and 16.)  His fourth and fifth grade IEP's contained specific goals to improve his phonetic decoding, word attack and oral answering of reading comprehension questions. (Joint Exs. 12; 18.)  When the Plaintiffs later requested

evaluations to review A.C.'s possible need for further speech language therapy and/or auditory processing services, the Defendant agreed to provide these but was unable to do so because the Plaintiffs had moved to New Jersey.  (Joint Ex. 25.)

Finally, although the Plaintiffs claim that the Defendant failed to identify and report A.C.'s fine motor disabilities, there is substantial evidence that the Defendant continually assessed his fine motor skills and identified shortcomings as they became apparent.  Through the third grade, the Defendant found these skills to be age appropriate.  (Joint Ex. 8; 10.)  His fourth grade IEP notes that his fine motor skills "need work in correct size, formation, and spacing (handwriting)."  (Joint Ex. 12, at 5.)  Ms. Pettes testified that this is a typical concern for most children as they move into cursive handwriting.  (Test., at 413, 419.)  In fifth grade, these skills were again determined to be age appropriate.  (Joint Ex. 18, at 3; 20.)  In fact, Ms. Barker tested his fine motor skills to be within the 65th percentile.  (Joint Ex. 21, at 8.)  When the Plaintiffs requested further investigation of A.C.'s fine motor skills, the Defendant agreed to provide an evaluation but again was unable to do so solely because A.C. had moved to New Jersey and was unavailable.  (Joint Ex. 25.)  This claim is thus without merit.

d. Failure to Inform About Assistive Technology

The Plaintiffs allege that they were not informed about the related services of occupational therapy and assistive technology that would have helped A.C. This claim also proves unavailing. The Plaintiffs do not have the right to dictate educational methodology or particular programming options, and the use of a particular methodology to address a disabled student's educational needs is within the discretion of the educators who developed the IEP. Rowley, 428 U.S. at 208; Todd D. by Robert D. v. Andrews, 933 F.2d 1576, 1581 (11th Cir. 1991). Moreover, the Plaintiffs have provided no evidence of any technology to which they were denied access. Therefore, they have failed to demonstrate any procedural violation of A.C.'s IEP sufficient to support a motion in their favor.

e. <u>Failure to Inform About A.C.'s Lack of Progress</u>

The Plaintiffs' final argument is that they were misinformed about A.C.'s lack of progress. They allege that the independent evaluation of A.C. shows that the Defendant falsely informed them that he was meeting his goals and "on track," when in fact he was achieving no academic progress. (Pls.' Mot. for Summ. J., at 44.) This is, in essence, an extension of their allegation that the Defendant failed to provide A.C. with a free appropriate public education. The Court thus discusses the merits of this substantive claim below.

2. <u>Substantive Rights - Free Appropriate Public Education</u>

A student's right to a free appropriate public education under the IDEA can be summarized as follows: "In order to satisfy its duty to provide a free appropriate public education to a disabled child, the state must provide personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." <u>Mandy S.</u>, 205 F. Supp. 2d at 1366 (<u>citing</u> <u>Drew P. v. Clarke County Sch. Dist.</u>, 877 F.2d 927, 930 (11th Cir. 1989)). As explicitly stated by the Supreme Court in <u>Rowley</u>, the Act does not require that the school maximize a student's potential, only that it provide a "basic floor of opportunity." <u>Rowley</u>, 458 U.S. at 201; <u>see also</u> <u>Loren F.</u> 349 F.3d at 1312 n.1 ("The FAPE described in an IEP need not be the best possible one ... rather, it need only be an education that is specifically designed to meet the child's unique needs, supported by services that will permit him to benefit from the instruction"). Under the IDEA, a school district need not guarantee a particular outcome. <u>Rowley</u>, 458 U.S. at 192.

> If the educational benefits are adequate based on surrounding and supporting facts, [IDEA] requirements have been satisfied. While a trifle might not represent adequate benefits, maximum improvement is never required. Adequacy must be determined on a case-by-case basis in the light of the child's individual needs.

<u>JSK, *ex. rel.* JK v. Hendry County School Bd.</u>, 941 F.2d 1563, 1573 (11th Cir. 1991) (citations omitted). In determining whether a student has received adequate

educational benefit, the Eleventh Circuit has further noted that courts should pay "great deference" to the educators who developed the IEP.  Id. at 1573.

Here, the evidence demonstrates that the Defendant constructed an appropriate IEP that allowed A.C. to receive sufficient educational benefit.  This educational benefit is apparent from his performance in the classroom – as demonstrated both by his IEP's and report cards – and by his results on state-mandated, system wide standardized tests.  First, he consistently achieved mastery of the majority of the goals on his IEP evaluations.  During the fourth grade, he mastered all of his goals except one, on which he was just three points below mastery.  (Joint Exs. 12; 18.)  During fifth grade, he again mastered all of his goals except one, where he was just two points below mastery.  (Joint Ex. 18; 25, at 27-28.)  Furthermore, his report cards demonstrate consistently satisfactory achievement in the areas of focus on his IEP.  In both his fourth and fifth grade years, he earned B's in language arts during every reporting period.  (Joint Exs. 36; 37.)  Additionally, on the Brigance Comprehensive Inventory of Basic Skills, A.C. advanced at least one grade level each year.  (Joint Exs. 12; 18.)  His scores on the Basic Literacy Test ("BLT") also steadily improved throughout his fourth and fifth grade years.  (Test., at 399; Joint Ex. 24.)

The Plaintiffs, however, argue that these indicators do not matter because they are merely part of the Defendant's effort to show false progress and advance A.C.

from grade to grade even though he was learning nothing in school.  First, far from being irrelevant, the Supreme Court has emphasized that the success or failure of a student's IEP is measured in part by its ability to enable the student to receive passing grades in the regular classroom.  <u>Rowley</u>, 458 U.S. at 204; <u>see also</u> <u>Cerra v. Pawling Cent. Sch. Dist.</u>, 427 F.3d 186, 196 (2d Cir. 2005) ("the attainment of passing grades and regular advancement from grade to grade will generally constitute evidence of satisfactory progress"); <u>Alex R., <i>ex. rel</i>. Beth R. v. Forrestville Valley Community Unit Sch. Dist.</u>, 375 F.3d 603, 615 (7th Cir. 2004) (stating that factors such as passing grades and advancement "usually show satisfactory progress").  Here, although A.C. was using a modified curriculum in language arts, he used grade level books and achieved satisfactory marks.

Several standardized tests, which the Defendant did not grade, further demonstrate A.C.'s academic progress.  On the CRCT, he met state-mandated requirements.  Ms. Pettes testified that this test is particularly useful in measuring special education students and that she had never witnessed a child pass it who could not read proficiently.  (Test., at 390-91.)  On the ITBS, A.C. advanced from a level of 2.0 in reading in the second grade to a level of 4.6 in the fifth grade.  (Joint Exs. 30; 31.)  He showed similar progress in the writing assessment, progressing from a Stage 2 Developing Writer in the third grade to a Stage 5 Engaging Writer in the fifth grade.

(Joint Exs. 32; 33.)  This test was administered outside the school by an independent state reviewer.

To refute this evidence, the Plaintiffs present several evaluations that allegedly show A.C.'s lack of educational benefit. First, they offer the results of a psychoeducational analysis performed by Ms. Barker after A.C. had begun fifth grade. On her exam, the Plaintiffs argue that even though A.C. tested in the estimated 98th percentile for I.Q., he ranked in the 1st percentile in spelling and contextual language writing skills.  (Joint Ex. 21, at 4.)  However, they neglect to mention that he tested in the 50th percentile in reading comprehension and capitalization, the 63rd percentile in story comprehension, and the 84th percentile in punctuation.  (Joint Ex. 21, at 4.) These were also focal areas on his IEP.  (Joint Exs. 12; 18.)  Moreover, declining percentile scores do not necessarily correlate with a lack of educational benefit.  See Houston Indep. Sch. Dist. v. Bobby R., 200 F.3d 341, 349 (5th Cir. 2000) ("declining percentile scores do not necessarily represent a lack of educational benefit, but only a child's inability to maintain the same level of academic progress achieved by his non-disabled peers"); Nein v. Greater Clark County Sch. Corp., 95 F. Supp. 2d 961, 975 (S.D. Ind. 2000) (acknowledging that falling percentile scores do not always demonstrate the failure of the school's IEP because "some children will always be below the mean, and if some children's test scores are improving relative to others'

in the same age group, then some children's scores will reflect drops in percentiles").

Thus, although Ms. Barker's analysis indicates that A.C. continued to struggle in basic

reading and writing, it does not show that he had received no educational benefit.

The Plaintiffs also point to the independent examination of A.C. by Dr.

Israelian, a clinical psychologist who concluded that as a 12 year old, A.C. was

reading only at an 8 year 8 month level.  (Test., at 299.) This Court, however, finds

Dr. Israelian's analysis to be of suspect reliability as a measure of educational benefit.

First, she did not measure or intend to measure A.C.'s academic progress, as this

cannot be determined by psychological testing alone.  (Id., at 679; Plaintiffs' Ex. 3.)

Furthermore, she opined that A.C. had not made any measurable progress based on

the results she obtained from the Woodcock-Johnson Achievement test, which is not

designed for nor capable of tracking academic achievement over time. (Test., at 544-

546.)  Evidence also showed that her testing deviated from standard testing protocol

in that A.C. was instructed not to take his ADHD medication and one test, the WISC-

III, was administered only eight months after its most recent prior administration.  (Id.,

at 590-91, 598.)  According to undisputed testimony by the Defendant's Coordinator

for Psychological Services, Jennifer Schau, the best practice for this test requires a

waiting period of at least a year in between administrations.  (Id., at 590, 598.)

Finally, the Defendant agreed to implement many of Dr. Israelian's suggestions even

before her evaluation was performed.  Her recommendation that A.C. receive a speech language evaluation, an occupational therapy evaluation, one-to-one   reading assistance, and possible enrollment in the Fast ForWord program had already been agreed to by the Defendant. (Joint Ex. 25, at 25.)  The Court thus finds that this evaluation does not demonstrate a lack of educational benefit.

The Plaintiffs' final evidence is the testimony of Ms. Lisa Gray, A.C.'s summer reading teacher.  They rely upon her testimony that A.C. had trouble decoding words from third and fourth grade books.  (Test., at 845.)  She further testified, however, that he met mastery of all of his reading objectives during that summer and that she found him to be working on a 5.1 grade level, an improvement from his 4.6 grade level reading score from the ITBS he had taken earlier that year.  Moreover, A.C.'s mother told Ms. Gray that her son was not taking his ADHD medication during the summer. (Id., at 827, 850.)

The record conclusively demonstrates A.C.'s parents' staunch commitment to their son's academic achievement.  It is also clear that this child remained behind his peers in certain areas of basic reading and written expression even after several years of focused attention by his IEP.  (Joint Ex. 20.)  The Defendant's own psychologist acknowledged that there was a significant discrepancy between A.C.'s ability and achievement rankings in basic reading, reading comprehension, and written

expression. (Joint Ex. 21, at 10.) However, the potential reasons why a child's I.Q. ranking would not match up with his academic performance are too numerous for this Court to infer failure to provide a free appropriate public education. In determining whether a school district has fulfilled its responsibilities under the IDEA, the Eleventh Circuit requires only that the school district establish an IEP that provides the student with a "basis floor of opportunity" so that he can achieve some educational benefit from that instruction. Rowley, 458 U.S. at 201.[4] The record conclusively

---

[4]The Plaintiffs cite to Polk v. Central Susquehanna Intermediate Unit 16, 853 F.2d 171, 182 (3d Cir. 1988), for the proposition that the IDEA requires "a great deal more than negligible benefit" for a student with considerable intellectual potential. (Pls.' Mot. for Summ. J., at 45.) The Court recognizes that both the Third and Sixth Circuits have adopted an interpretation of Rowley that expressly considers the student's academic potential in determining proper educational benefit. See, e.g., Deal v. Hamilton County Bd. of Educ., 392 F.3d 840, 862 (6th Cir. 2004); T.R. v. Kingwood Tp. Bd. of Educ., 205 F.3d 572, 578 (3d Cir. 2000) (Alito, J.) ("To fulfill this mandate a district court must 'analyze the type and amount of learning' of which the student is capable."). These courts emphasize that a satisfactory IEP must confer "meaningful" benefit, as gauged in relation to a child's potential. Deal, 392 F.3d at 862; T.R., 205 F.3d at 578. The Court finds that this authority does not support the Plaintiffs' assertion that under the IDEA, A.C.'s level of success relative to his peers must somehow correlate with his I.Q. First, none of these cases from other circuit courts considered the child's I.Q. as a measure of his potential. Furthermore, even if these other courts support a comparison between the student's I.Q. and achievement rankings, the Eleventh Circuit does not subscribe to the Third and Sixth Circuit's definition of the term "meaningful." Deal, 392 F.3d at 863. In JSK, the Eleventh Circuit concluded that "meaningful" meant nothing more than "some" or "adequate" educational benefit. JSK, 941 F.2d at 1572. While the court acknowledged that adequacy was determined in light of the child's individual needs, it stressed that the IEP must provide only a "basic floor of opportunity" to a disabled child who, before the passage of the IDEA, "might otherwise have been excluded from any educational

demonstrates that the Defendant created an IEP specifically designed to meet A.C.'s educational needs. Over the course of his attendance in FCSD, moreover, his grades, IEP reports, and standardized test scores all indicate that he was making adequate academic progress. The Court thus concludes that he received a free appropriate public education as required by the IDEA.

Furthermore, in order for the Plaintiffs to receive reimbursement for A.C.'s private instructional expenses, the private education must be appropriate to fit his needs. 20 U.S.C. § 1412(a)(10)(C). The Supreme Court has made it clear that the chosen private placement must be "reasonably calculated to enable the child to receive educational benefits." Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 11 (1993). This Court agrees with other courts holding that the student and his parents bear the burden of demonstrating that the private placement is appropriate. See M.S. ex rel. S.S. v. Board of Educ. of the City Sch. Dist. of the City of Yonkers, 231 F.3d

_____

opportunity." Id. at 1572-73. This continues to be the standard in the Eleventh Circuit for determining whether a student's IEP complies with the requirements of the IDEA. See Devine, 249 F.2d at 1289 (reaffirming JSK and emphasizing that educational benefit need not be maximized and that FAPE requires nothing more than "measurable and adequate gains in the classroom"). Thus, despite the Plaintiffs' exhaustive referencing of A.C.'s high I.Q. ranking, (see Pls.' Mot. for Summ. J., at 2, 3, 13, 37, 45, 46), this Court must conclude from Eleventh Circuit precedent that a student's above average I.Q. does not mandate a higher measure of adequacy. See also A.B. ex rel. D.B. v. Lawson, 354 F.3d 315, 327 (4th Cir. 2004) (recognizing that a school has not failed its duty under the IDEA simply because a student with an above average I.Q. is not fulfilling his potential in a general education setting).

96, 104 (2d Cir. 2000); <u>Linda W. v. Indiana Dept. of Educ.</u>, 200 F.3d 504, 506 (7th Cir. 1999) (<u>citing</u> <u>School Comm. of Town of Burlington, Mass. v. Department of Educ. of Mass.</u>, 471 U.S. 359 (1985)); <u>Carlisle Area Sch. v. Scott P.</u>, 62 F.3d 520, 533 (3rd Cir. 1995).  Here, the Plaintiffs have provided no evidence to demonstrate the appropriateness of Sylvan Learning Centers or the Lindamood-Bell program.[5]  For all these reasons, summary judgment for the Defendant is appropriate.

       B. <u>Section 504 of the Vocational Rehabilitation Act and Title II of the ADA</u>

       The Defendant also moves to dismiss the Plaintiffs' claims that FCSD, as a matter of policy and practice, discriminated against A.C. based on his disability in violation of section 504 of the Vocational Rehabilitation Act and Title II of the ADA. Under section 504:

> No otherwise qualified handicapped individual in the United States ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

29 U.S.C. § 794(a); <u>Manecke v. School Bd. of Pinellas County, Fla.</u>, 762 F.2d 912, 921 (11th Cir. 1985).  Title II of the ADA similarly states: "No qualified individual with a disability shall, by reason of such disability, be excluded from participation in

---

[5]A.C. also cannot receive compensation for future services from Lindamood-Bell because he is no longer a resident of FCSD.

or be denied the benefits of the services, programs, or activities of a public entity, or

be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  Because the

ADA and section 504 are identical anti-discrimination statutes prohibiting federally

funded bodies from denying disabled individuals access to benefits, the interpretations

of one act apply to the other.  Waddell v. Valley Forge Dental Assocs., Inc., 276 F.3d

1275, 1280 (11th Cir. 2001).  The Plaintiffs have failed to respond to the Defendant's

motion on this claim, indicating that they do not oppose it.  L.R. 7.1(B).  The Court

deems this failure to be an abandonment of the claim.  See City of Lawrenceville v.

Ricoh Electronics, Inc., 370 F. Supp. 2d 1328, 1333 (N.D. Ga. 2005).  Moreover, in

the Eleventh Circuit, a disparate treatment claim for compensatory damages under

section 504 must fail in the absence of intentional discrimination or bad faith.  Wood

v. President and Trustees of Spring Hill College in City of Mobile, 978 F.2d 1214,

1219 (11th Cir. 1992).  To make a claim under section 504 in the education context,

something more than an IDEA violation for failure to provide a free appropriate public

education in the least restrictive environment must be shown.  N.L. ex rel. Mrs. C. v.

Knox County Schs., 315 F.3d 688, 695 (6th Cir. 2003); Sellers by Sellers v. School

Bd. of City of Mannassas, Va., 141 F.3d 524, 529 (4th Cir. 1998); Monahan v.

Nebraska, 687 F.2d 1164, 1170 (8th Cir.1982).  Thus, for either statute, the Plaintiffs

must show intentional discrimination or bad faith, which they have failed to do. Summary judgment for the Defendant is thus merited on this claim.

### V. CONCLUSION

For the reasons set forth above, the Defendant Fulton County School District's Motion for Summary Judgment [Doc. 57] is GRANTED and the Plaintiffs A.C. and his parents' Motion for Partial Summary Judgment [Doc. 58] is DENIED.

SO ORDERED, this 28 day of June, 2006.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge